# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JACK CARLISLE, | ) | CASE NO. 1:09-CV-02590 |
| | ) | |
| Petitioner, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| VINCENT HOLLAND, | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

Petitioner, Jack Carlisle ("Carlisle"), challenges the constitutionality of his conviction in the case of *State v. Carlisle*, Cuyahoga County Court of Common Pleas Case No. CR-481858. Carlisle, represented by counsel, filed his Petition for a Writ of Habeas Corpus (Doc. No. 1) pursuant to 28 U.S.C. § 2254 on November 6, 2009.  On February 1, 2010, Vincent Holland ("Respondent"), by and through the Cuyahoga County Prosecutor, filed his Answer/Return of Writ.  (Doc. No. 9.)  Carlisle filed a Traverse on May 20, 2010.  (Doc. No. 13.)  On December 23, 2010, the Court heard oral arguments.  Subsequently, Respondent filed a Supplemental Brief and additional records.  (Doc. Nos. 23 & 25.)  For reasons set forth in detail below, it is recommended that Carlisle's petition be DENIED.

## I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts "shall be presumed to be correct."

28 U.S.C. § 2254(e)(1); *see also House v. Bell,* 283 F.3d 37 (6th Cir. 2002). The state appellate court summarized the facts underlying Carlisle's conviction as follows:

> P4 The evidence presented at trial established that the six-year old victim, K.C., and her nine-year old brother were foster children, since infancy, of Carlisle and his wife Carol. The minor children resided in University Heights, Ohio with the Carlisles, their two adult sons, one of whom was mentally disabled, and with Carol's adult daughter. K.C. either slept on a mattress in the bedroom Carlisle shared with his wife, or sometimes on a sofa bed in the living room. K.C.'s brother slept in the attic with Carol's adult daughter.

> P5 On May 12, 2006, Carol asked Carlisle to babysit K.C. and her brother, while she and her disabled adult son went to visit her brother, who was visiting from out of town. When Carol left to visit her brother, her older son was at work and her adult daughter was upstairs in the attic.

> P6 At trial, K.C. testified that on May 12, 2006, she and her brother were watching television in the room that Carlisle shared with Carol. K.C. testified that when they heard Carlisle approaching, her brother, who was not supposed to be in the room, hid in the closet. K.C. continued to watch television.

> P7 K.C. testified that Carlisle entered the room, closed the door behind him, sat on his bed and told her to come to him, but she continued to watch television. K.C. testified that Carlisle came over to her, picked her up, and placed her on the bed. K.C. testified that Carlisle laid her on her back, then removed his pants, put lotion on his penis, climbed on top of her, and inserted his penis inside her.

> P8 K.C. testified that Carlisle began moving side to side and up and down. K.C. testified that she felt gooey stuff inside her "private." K.C. testified that she told Carlisle to stop. K.C. stated that Carlisle eventually stopped, got off her, and later lay on his bed pretending to sleep.

> P9 K.C. testified that sometime later, her brother sneaked out of the closet, came over to her, and motioned her to follow him out the room. K.C. testified that she and her brother crawled out the room, went upstairs, and told Carol's adult daughter.

> P10 K.C.'s brother, Kh.C., testified that on May 12, 2006, he was watching television in the bedroom Carlisle shared with his wife. When he heard Carlisle coming, he hid in the closet because he did not have permission to be in the room. Kh.C. testified that when Carlisle entered the room, Carlisle said "get out of the closet," but he remained hidden under some clothes.

P11 Kh.C. testified that he watched as Carlisle put K.C. on the bed, removed his pants, got on top of K.C. and began moving up and down. Kh.C. testified that he heard K.C. say "ouch."  Kh.C. testified that Carlisle eventually got off K.C., unlocked the bedroom door, and then went to lay on his bed. Kh.C. testified that he later sneaked out of the closet, went over to K.C., and the two crawled out of the room to report the incident to Carol's adult daughter.

P12 At trial, Kh.C. demonstrated how he crawled from the closet to K.C. and out of the room. Kh.C. also testified about a picture he had drawn at the police station, shortly after the incident, which depicted the bedroom and the closet where he hid.

P13 Alshea Laney, Carol's adult daughter, testified that on the evening of May 12, 2006, she was upstairs reading when Kh.C. entered the room crying. Kh.C. indicated that he had seen Carlisle on top of K.C. going up and down.  Laney testified that she spoke with K.C., who stated "Jack did something wrong."  Laney testified that she telephoned her sister, and after discussing the matter, they agreed K.C. and Kh.C. should tell Carol when she returned home.

P14 Later that evening when Carol returned home, the children reported the incident. After visually inspecting K.C., Carol took both children to the University Heights police station, where K.C. and Kh.C. were interviewed separately. Carol then took the children to Hillcrest Hospital, where a rape kit examination was completed.

P15 While at the hospital, Carol gave consent to the University Heights police to search the marital home. The police proceeded to the home, informed Carlisle there was an allegation of abuse, and arrested him. The police then executed the search, wherein they confiscated Carlisle's bedding, a bottle of lotion, and the clothing that was on the bed. The police also took the bedding from the mattress K.C. slept on.

P16 At trial, the evidence established that after scientific testing, nothing was detected on the bedding taken from the house. Carlisle's DNA was found on his underwear, but the examiners could not determine whether the DNA was seminal fluid. Some seminal fluid was detected on Carlisle's undershirt and trousers. Testing conducted on K.C.'s underwear revealed the possible presence of male DNA.  Further testing revealed the presence of potentially two contributing males related through their paternal lineage.[1]

---

[1]  More specifically, the testimony of Julie Heinig, Ph.D., reveals that a DNA swab [Swab 0.1C] taken from the entirety of the victim's underwear, inside and out, tested as a potential match for Carlisle.  (2nd Trial Tr. 600-01.)  In Dr. Heinig's own words, she

P17 At trial, several of the police officers from the City of University Heights, who arrested, processed, or interviewed Carlisle testified. Detective Frank Gromosky testified that after the search was executed, he conducted a tape-recorded interview of Carlisle. Detective Gromosky testified that during the interview, Carlisle indicated that at the time of his arrest, the police told him that the allegations involved child abuse. Detective Gromosky further testified that during the interview, Carlisle indicated that he did not and could not have assaulted K.C. because he was impotent and had a host of other medical problems. Detective Gromosky testified that Carlisle also claimed that he had not had sex for three or four years.

P18 Detective Steven Williams testified that they conducted a second tape-recorded interview with Carlisle. Detective Williams testified that between the first and second interviews, they spoke with Carlisle's wife, who indicated that the couple had engaged in sexual intercourse within the past six to seven months.

P19 Detective Williams testified that during the second interview, Carlisle recalled that on May 12, 2006, his wife asked him to babysit K.C. and Kh.C., while she visited her relatives. Detective Williams testified that Carlisle recalled that when he went downstairs, he discovered that K.C. had spilled toothpicks all over the floor, and he instructed her to pick them up, after which he told K.C. to sit in a "time out" chair.

P20 Detective Williams testified that Carlisle indicated that he dozed off on the sofa, but was awaken to K.C. climbing a chair trying to reach crayons. He placed her in "time out" again, and K.C. began to cry, at which time he relented and allowed her to go to the third floor. Carlisle indicated that he took this opportunity to take a nap upstairs in his bedroom.

P21 Detective Williams testified that Carlisle indicated that while in his bed, K.C. entered the room and wanted to change into her pajamas. Carlisle indicated that after K.C. changed into her pajamas, she climbed into the bed; he asked her to leave, and told Kh.C., whom he knew was hiding in the closet, to get out.  Carlisle stated that K.C. and Kh.C. proceeded to watch television and then left the room, after which he went to sleep.

P22 Detective Williams testified that Carlisle indicated that he did not awake until his wife returned home, and later informed him that she had to go back out.

---

testified that: "Jack Carlisle, or any of his paternally related male relatives, cannot be excluded as a contributor to this profile."  (Tr. 603.)  It also bears noting that the DNA could have been from any source, such as saliva, sweat, skin cells, but not blood or semen.  (Tr. 598-99, 608.)

Carlisle indicated that after his wife left with K.C. and Kh.C., he went downstairs to watch television and later fell asleep.  Carlisle stated that his son woke him about 1:30 a.m., when the police arrived.

P23 At trial, Dr. Alan Seftel, a urologist from University Hospital, with special training in the area of erectile dysfunction, testified as an expert on impotence.  Dr. Seftel opined that the finding of seminal fluid on Carlisle's clothing indicated that Carlisle was capable of at least a partial erection and ejaculation.  Dr. Seftel testified that the presence of seminal fluid could have resulted from a nocturnal emission, which would demonstrate that Carlisle was having erections and could ejaculate.  Finally, Dr. Seftel testified that despite Carlisle's various medical ailments, he remained capable of erections.

P24 Dr. Marina Molinari-Zuzek said that she was the attending physician at Hillcrest Hospital and treated K.C. on May 12, 2006.  Dr. Molinari-Zuzek testified that K.C. indicated that Carlisle was rubbing up and down and side to side with his underwear off and told her not to tell anybody.  K.C. also indicated that her brother, who was in the closet, saw it happen.  Dr. Molinari-Zuzek testified that K.C. indicated that her vaginal area was hurting.

P25 Dr. Molinari-Zuzek testified that her examination revealed that K.C.'s entire vaginal area was swollen, severely red and irritated. As a result of her examination, Dr. Molinari-Zuzek testified that it was her opinion that inappropriate sexual contact had taken place.  Dr. Molinari-Zuzek testified that she could not tell if penetration occurred, but she suspected it did not.  Dr. Molinari- Zuzek further testified that the condition of K.C.'s vaginal area could not be explained by an accidental injury.

P26 Carol testified that she and Carlisle had been married for twenty-seven years and raised four of their own children, and several foster children, including K.C. and her brother Kh.C.  Carol testified that the day after she took the children to the police, she began to suspect that K.C. and Kh.C. were not telling the truth.  Carol testified that while at the hospital the previous night, the children were running, jumping around, and doing cartwheels.  Carol testified that both K.C. and Kh.C. were being treated for various behavioral issues, including lying.  Carol testified that she later returned to the police station, voiced her concerns and asked them to investigate further, but they refused.  Carlisle took the stand in his own defense, and his testimony conformed in large part to the tape-recorded interviews, which were played in court.  Carlisle testified that on May 12, 2006, he was very tired when he arrived home from work and not happy that Carol needed him to babysit the children.  Carlisle testified that at one point, both K.C. and Kh.C. were playing in the closet and swinging on the bars.  He stated he told them to stop and instructed them to sit and quietly watch television.  Carlisle testified that he fell asleep while the children were watching television.

*State v. Carlisle*, 2008 Ohio App. LEXIS 3232 (Ohio Ct. App., Jul. 31, 2008).

## II. Procedural History

### A.  Conviction

On June 9, 2006, a Cuyahoga County Grand Jury charged Carlisle with one count of rape in violation of Ohio Revised Code ("O.R.C.") § 2907.02(A)(1)(b), one count of gross sexual imposition in violation of O.R.C. § 2907.05(A)(4), and one count of kidnapping in violation of O.R.C. § 2905.01(A)(2) and/or (A)(4).  On July 4, 2007, a second trial commenced resulting in a jury verdict of guilty as to the gross sexual imposition and kidnapping charges and not guilty as to the rape charge.[2]  The trial court sentenced Carlisle to a term of three years incarceration for the kidnapping and one year for gross sexual imposition.  The charges were merged at sentencing resulting in a total term of three years.  Carlisle's bond was continued pending his appeal.  (Doc. No. 17, Exh. A., *State v. Carlisle*, No. 93266, 2010-Ohio-3407 at ¶2 (Ohio Ct. App., Jul. 22, 2010).)

### B.  Direct Appeal

Carlisle, through new counsel, appealed to the Court of Appeals for the Eighth Appellate District ("state appellate court").  He raised the following assignments of error:

> I.  Jack Carlisle was deprived of his constitutional right to equal protection under the law, when the State removed all black male jurors from the venire panel, leaving him entirely without a jury of his peers.
>
> II.  Jack Carlisle was denied his right to confront and cross-examine witnesses, his right to present a defense and his rights to a fair trial and due process of law, in violation of the U.S. Constitution's Fifth, Sixth and Fourteenth Amendments and Article I, §§ 10 and 16 of the Ohio Constitution, when the

---

[2]  The first trial, which commenced on May 14, 2007, resulted in a mistrial after the jury failed to reach a verdict.

-6-

court improperly barred him from introducing evidence that the alleged child victim had accused other family members of committing the sexual abuse charged in this case.

III. Jack Carlisle was denied his constitutional right to a fair trial before a jury free from outside influences by the repeated introduction of victim impact evidence during the State's case in Chief

IV. Mr. Carlisle's Sixth Amendment right to the effective assistance of counsel was violated where trial counsel failed to act zealously on his behalf in several instances.

(Doc. No. 9, Exh. A.)

On July 31, 2008, the state appellate court affirmed Carlisle's conviction. (Doc. No. 9, Exh. H.) On August 7, 2008, Carlisle filed a Motion for Reconsideration, which was denied on September 11, 2008. (Doc. No. 9, Exhs. E & G.)

On October 24, 2008, Carlisle filed a Notice of Appeal with the Supreme Court of Ohio, submitting the following proposition of law:

Evidence that complaining witness was sexually assaulted by someone other than the defendant when offered to show he did not commit the crime charged is not prohibited by the rape shield law.

(Doc. No. 9, Exh. N.) The appeal was dismissed as not involving any substantial constitutional question. (Doc. No. 9, Exh. P.)

**C. Modified Sentence and Appeal**

Before Carlisle's appellate bond was revoked, he filed a motion to reconsider his sentence. *State v. Carlisle*, 2010-Ohio-3407 at ¶3. The trial court modified its sentence and imposed a five year term of community control. *Id*. at ¶8. Finding that the modified sentence violated its prior appellate mandate affirming Carlisle's conviction, the state appellate court reversed and remanded for execution of the original sentence. *Id*. at ¶¶47-49.

-7-

### D.    Federal Habeas Petition

On November 6, 2009, Carlisle filed a Petition for Writ of Habeas Corpus and asserted

the following ground for relief:

> GROUND ONE: The Petitioner was denied his constitutional right to
> confrontation, his right to present a defense and his rights to due process and a
> fair trial when the trial court barred him from presenting evidence that the
> complaining witness had claimed other family members had committed the sexual
> abuse charged in this case.

(Doc. No. 1.)

### III.  Exhaustion and Procedural Default

### A.    Exhaustion Standard

State prisoners must exhaust their state remedies prior to raising claims in federal habeas

corpus proceedings.  *See* 28 U.S.C. § 2254(b),( c).  This requirement is satisfied "when the

highest court in the state in which the petitioner was convicted has been given a full and fair

opportunity to rule on the petitioner's claims."  *Manning v. Alexander*, 912 F.2d 878, 881 (6th

Cir. 1990).  However, if relief is no longer available in state court, exhaustion can be rendered

moot:  "If no remedy exists, and the substance of a claim has not been presented to the state

courts, no exhaustion problem exists; rather, it is a problem of determining whether cause and

prejudice exist to excuse the failure to present the claim in the state courts."  *Rust v. Zent*, 17

F.3d 155, 160 (6th Cir. 1994); *see Buell v. Mitchell*, 274 F.3d 347, 349 (6th Cir. 2001).

### B.    Procedural Default Standard

Federal courts will not consider the merits of procedurally defaulted claims, unless the

petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure

to review the claim would result in a fundamental miscarriage of justice.  *See Lundgren v.*

*Mitchell*, 440 F.3d 754, 763 (6th Cir.2006) (*citing Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

A claim may become procedurally defaulted in two ways. *Id*.  First, a petitioner may

procedurally default a claim by failing to comply with state procedural rules in presenting his

claim to the appropriate state court.  *Id.*; *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.

1986). If, due to petitioner's failure to comply with the procedural rule, the state court declines to

reach the merits of the issue, and the state procedural rule is an independent and adequate

grounds for precluding relief, the claim is procedurally defaulted.[3] *Id*.

Second, a petitioner may also procedurally default a claim by failing to raise and pursue

that claim through the state's "ordinary appellate review procedures."  *O'Sullivan v. Boerckel*,

526 U.S. 838, 848 (1999).  If, at the time of the federal habeas petition, state law no longer

allows the petitioner to raise the claim, it is procedurally defaulted. *Engle v. Isaac*, 456 U.S. 107,

125 n. 28 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991).  This second

type of procedural default is often confused with exhaustion. Exhaustion and procedural default,

however, are distinct concepts.  AEDPA's exhaustion requirement only "refers to remedies still

available at the time of the federal petition." *Engle*, 456 U.S. at 125 n. 28.  Where state court

remedies are no longer available to a petitioner because he failed to use them within the required

time period, procedural default and not exhaustion bars federal court review.  *Id*.  In Ohio, a

petitioner is not entitled to raise claims in post-conviction proceedings where those claims could

---

[3]  In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a
claim is procedurally defaulted.  785 F.2d at 135.  Under this test, the Court decides
(1) whether the petitioner failed to comply with an applicable state procedural rule,
(2) whether the state courts actually enforced the state procedural sanction, (3) whether
the state procedural bar is an "independent and adequate" state ground on which the state
can foreclose federal review, and (4) whether the petitioner has demonstrated "cause"
and "prejudice."  *Id*. at 138-39; *Barkley v. Konteh*, 240 F.Supp.2d 708 (N.D. Ohio 2002).

-9-

have been raised on direct appeal.  *Id*.  Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is procedurally defaulted.  *Id*.

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his claim.  *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue--not merely as an issue arising under state law."  *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law."  *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003).

A petitioner's procedural default, however, may be excused upon a showing of "cause" for the procedural default and "actual prejudice" from the alleged error.  *See Maupin*, 785 F.2d at 138-39.  "Demonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule."  *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) (*quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected with constitutional error."  *Id*.  Where there is strong evidence of a petitioner's guilt and the evidence supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied.  *See*

*United States v. Frady*, 456 U.S. 152, 172 (1982); *Perkins v. LeCureux*, 58 F.3d 214, 219-20 (6th Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different. *See Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003) (*citing Strickler v. Greene*, 527 U.S. 263, 289 (1999)).

Finally, a petitioner's procedural default may also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice." *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991). Conclusory statements are not enough – a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995)*; See Jones v. Bradshaw*, 489 F.Supp.2d 786, 807 (N.D.Ohio 2007).

**C.    Analysis**

Respondent argues that Carlisle's sole ground for relief is procedurally defaulted. (Doc. No. 9 at 14-16.) Carlisle argues that he was denied his constitutional right to confrontation, his right to present a defense and his rights to due process and a fair trial when the trial court barred him from presenting evidence that K.C., the complaining witness, had claimed other family members committed the sexual abuse charged in this case. (Doc. No. 1.) Specifically, Carlisle maintains that he was prevented from presenting evidence that one or more of K.C.'s brothers had caused the injuries she sustained on or about May 12, 2006. (Doc. No. 8 at 7.)

Before the state appellate court, Carlisle plainly raised these same alleged constitutional violations. (Doc. No. 9, Exh. A at 13-23.) In the Ohio Supreme Court, Carlisle also argued that

-11-

exclusion of certain evidence violated his federal constitutional right to mount a defense. (Doc. No. 9, Exh. 15 at 9-14.) Respondent asserts that Carlisle's claim is procedurally defaulted because the evidence that Carlisle maintains should have been admitted during trial was barred by Ohio's hearsay rules, not by the Rape Shield statute. (Doc. No. 9 at 14-16.) Respondent contends that Carlisle never argued that exclusion of the evidence under the hearsay rule violated his federal constitutional rights. *Id*. The Court disagrees. Carlisle clearly argued before the state courts that the trial court's evidentiary rulings resulted in a violation of his federal constitutional rights. His arguments relied upon federal cases employing constitutional analysis and he phrased his claims in terms of federal constitutional law. With respect to an exhaustion and procedural default analysis, it is immaterial whether the trial court excluded the disputed evidence because it was hearsay or because admission would have been contrary to Ohio's Rape Shield law.[4] The essence of Carlisle's argument is that the state court's ruling, regardless of the basis for that ruling, frustrated his right to present a defense and to confront the witnesses against him.

In any case, the United States Supreme Court has observed that federal courts are not required to address a procedural default issue before deciding against a petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997). The Sixth Circuit has also approved this rule where the procedural default question is complicated and unnecessary to the court's determination of the case. *Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003); *Jackson v.*

---

[4] Though it is not entirely clear from the record, it appears that the trial court granted the prosecutor's motion *in limine* to prevent Carlisle from eliciting testimony regarding the past sexual activity of the victim through hospital reports or second hand testimony. (2nd Trial Tr. 5-6 ; *cf.* 1st Pretrial Tr. 32-42.) It is even less clear whether this exclusion was based on Ohio's Rape Shield law, the rules against hearsay evidence, or both.

*Anderson*, 141 F.Supp.2d 811, 826-27 (N.D. Ohio 2001).  As such, the Court will proceed to the merits of Carlisle's petition.

## IV.  Review on the Merits

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings of the United States Supreme Court.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  However, an explicit statement by the Supreme Court is not mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent" also qualify as "clearly established law." *Ruimveld*, 404 F.3d at 1010 (*quoting Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002)).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially

-13-

indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413.  By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id.* at 410-12.  "This standard generally requires that federal courts defer to state-court decisions."  *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (*citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

**A. Ground One: Rights to Confrontation, Present a Defense, and Fair Trial**

In his sole ground for relief, Carlisle claims that his right to confront witnesses, to present a defense, and to due process and a fair trial were violated when the trial court barred him from presenting evidence that the victim had claimed family members – other than the defendant – had committed the charged sexual abuse.  (Doc. No. 1.)  As a threshold matter, although there is some evidence of other acts of sexual abuse suffered by the complaining witness, nowhere in the record is there any evidence that the victim claimed anyone other than Carlisle committed the acts charged in this case.  That aside, Carlisle's arguments, though interrelated, appear to be founded on two alleged deficiencies in the trial court's rulings: (1) that he was prevented from cross-examining witnesses regarding the possibility that someone else committed the sexual abuse; and (2) that he was prevented from introducing documents supporting his theory that

-14-

someone else committed the sexual abuse.[5]  Carlisle asserts that this evidence was precluded

based on the trial court's construction of Ohio's Rape Shield law and/or hearsay rulings.  (Doc.

No. 8.)

"The Supreme Court has repeatedly recognized that the right to present a complete defense

in a criminal proceeding is one of the foundational principles of our adversarial truth-finding

process."  *Gagne v. Booker*, 606 F.3d 278, 283 (6th Cir. 2010), *vacated by* 2010 U.S. App.

LEXIS 15052 (6th Cir. July 20, 2010) (case restored to docket as a pending appeal).  In *Holmes v.*

*South Carolina*, the Supreme Court's decision contains the following discussion:

> "[S]tate and federal rulemakers have broad latitude under the Constitution to
> establish rules excluding evidence from criminal trials."  *United States v.*
> *Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998); *see also*
> *Crane v. Kentucky*, 476 U.S. 683, 689-690, 106 S. Ct. 2142, 90 L. Ed. 2d 636
> (1986); *Marshall v. Lonberger*, 459 U.S. 422, 438, n. 6, 103 S. Ct. 843, 74 L. Ed.
> 2d 646 (1983); *Chambers v. Mississippi*, 410 U.S. 284, 302-303, 93 S. Ct. 1038,
> 35 L. Ed. 2d 297 (1973); *Spencer v. Texas*, 385 U.S. 554, 564, 87 S. Ct. 648, 17
> L. Ed. 2d 606 (1967).  This latitude, however, has limits. "Whether rooted directly
> in the Due Process Clause of the Fourteenth Amendment or in the Compulsory
> Process or Confrontation Clauses of the Sixth Amendment, the Constitution
> guarantees criminal defendants 'a meaningful opportunity to present a complete
> defense.'"  *Crane*, *supra*, 476 U.S. at 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636
> (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed.
> 2d 413 (1984); citations omitted).  This right is abridged by evidence rules that
> "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or
> 'disproportionate to the purposes they are designed to serve.'"  *Scheffer*, *supra*,
> 523 U.S.at 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (quoting *Rock v. Arkansas*,
> 483 U.S. 44, 58, 56, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987)).
>
>                                     ***
>
> While the Constitution thus prohibits the exclusion of defense evidence under
> rules that serve no legitimate purpose or that are disproportionate to the ends that
> they are asserted to promote, well-established rules of evidence permit trial judges
> to exclude evidence if its probative value is outweighed by certain other factors

---

[5]  The Court has reviewed documents submitted for in camera inspection.  (Doc. No. 19.)

such as unfair prejudice, confusion of the issues, or potential to mislead the jury. *See, e.g.*, Fed. Rule Evid. 403; Uniform Rule of Evid. 45 (1953); ALI, Model Code of Evidence Rule 303 (1942); 3 J. Wigmore, Evidence §§ 1863, 1904 (1904). Plainly referring to rules of this type, we have stated that the Constitution permits judges "to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane*, 476 U.S., at 689-690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); ellipsis and brackets in original). *See also Montana v. Egelhoff*, 518 U.S. 37, 42, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996) (plurality opinion) (terming such rules "familiar and unquestionably constitutional").

A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged. *See, e.g.*, 41 C. J. S., Homicide § 216, pp 56-58 (1991) ("Evidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded"); 40A Am. Jur. 2d, Homicide § 286, pp 136-138 (1999) ("[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged . . . . [Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial" (footnotes omitted)). Such rules are widely accepted, and neither petitioner nor *his* amici challenge them here.

*Holmes v. South Carolina*, 547 U.S. 319, 324-27, 126 S. Ct. 1727 (2006).

Generally, it is not this Court's function to reach its own conclusion whether the trial court's decision to exclude certain evidence was constitutional. *See Gagne*, 606 F.3d at 285. However, where a state court does not articulate the reasoning behind its decision or, as here, fails to address the federal constitutional issues presented, a habeas court must look at the state court's decision and conduct an independent inquiry as to whether the decision was contrary to clearly established federal law or based upon an unreasonable determination of the facts in light of the evidence presented. *See Schoenberger v. Russell*, 290 F.3d 831, 835 (6th Cir. 2002);

-16-

*Harris v. Stovall*, 212 F.3d 940, 943 & n.1 (6th Cir. 2000), *cert. denied*, 532 U.S. 947, 121 S. Ct. 1415, 149 L. Ed. 2d 356 (2001). Here, a review of the state appellate court's opinion reveals that it did not address whether the relevant evidentiary rulings violated Carlisle's federal constitutional rights. *See Carlisle*, 2008 Ohio App. LEXIS 3232 at **20-24. In fact, the opinion does not address federal law despite Carlisle's explicit citations to various Supreme Court decisions in his appellate brief. *Id.* Instead, the decision merely finds that Ohio's evidentiary rules were properly followed.[6] Therefore, "because the state courts never addressed the merits of petitioner's claim, this Court conducts a *de novo* review." *Mickens v. Moore*, 2008 U.S. Dist. LEXIS 29156, 2008 WL 1696962 (S.D. Ohio Apr. 9, 2008), *citing Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005), *citing Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003).

Carlisle alleges that the trial court absolutely barred him from presenting any evidence that someone else perpetrated the sexual abuse. Testimony suggesting that someone else perpetrated the sexual abuse on or about the day in question could potentially come from several sources: Children's Services' records, medical records, testimony of Carlisle's wife Carol, testimony of social workers, testimony of the victim herself, and, if available, the testimony of the other alleged abuser. According to *Holmes*, to run afoul of the Constitution, a state court's evidentiary rule must not only infringe upon a defendant's weighty interest, but also must be arbitrary or disproportionate to the purposes the rule is designed to serve. *See Hudson v. Curtin*, 2010 U.S. App. LEXIS 6758 at *10 (6th Cir., Mar. 31, 2010).

---

[6] In his Supplemental Brief, Respondent argues that "[t]he deferential standard applies regardless of whether the state court cited to or relied upon United States Supreme Court case law," but acknowledges that "AEDPA's deferential standard of review does not apply if a state court does not address the merits of a claim properly raised ...." (Doc. No. 23 at 3.)

At the second trial resulting in Carlisle's conviction, Dr. Molinari testified that, upon examination, the victim had "an extreme amount of redness of her upper perineum like close by her clitoris and labia-majora....  There was a lot of irritation and redness, not scratches, not cuts, but just a lot of irritation and not in an area where I would typically [expect] because a child maybe didn't whipe [sic] as well.  It was in the upper portion of her privates which was consistent with what she had mentioned to me about somebody rubbing against her on top of her." (2ⁿᵈ Trial Tr. 450.)  She further testified that the redness would have occurred in the ***past 24 to 36 hours, but most likely within the last twelve hours***.  *Id*. at 451 (emphasis added).  She also testified that it was "impossible to tell" if penetration occurred.  *Id*. at 453.  She concluded, however, that a sexual assault had occurred.  *Id*. at 455.

Carlisle has offered no evidence, through hearsay sources or otherwise, that the victim was sexually assaulted by anyone else within 36 hours of Dr. Molinari's examination.  The time frame is significant because, as Dr. Molinari testified, the severity and amount of redness in the victim's genital area was indicative of abuse that had occurred recently.  At oral arguments, Carlisle's counsel acknowledged that allegations of abuse outside the 36-hour window would not be properly admissible.  (Tr. 13-14.)

### 1.        Records from Children's Services

The documents from Children's Services contain an allegation that two of K.C.'s brothers, aged twelve and eleven, removed K.C.'s pants, laid her down on the floor, and placed their younger brother (aged four) whose clothes were also removed, on top of her.  Children and Family Services concluded that these allegations against K.C.'s twelve and eleven-year-old brothers were unsubstantiated, as "no evidence of sexual abuse was found."  Furthermore, the

incident report, dated August 1, 2006, noted that this "may have happened 6 months ago," which would place the incident near February of 2006 – long before the relevant injuries sustained by the victim on or about May 12, 2006.

At oral arguments, Carlisle's counsel argued that the allegations against the brothers were brought to a  social worker's attention in October of 2006, and that six months earlier would place it in the broad time-frame of the May 12, 2006 incident.  (Oral Arguments Tr. 4.) Although an Assessment Survey Report, dated October 3, 2006, that catalogued all of the victim's various issues indeed references the aforementioned abuse allegation by the brothers, this does not appear to be to a new incident report.  Rather, the records are fairly consistent that a complaint was made to Children and Family Services on August 1, 2006.  The Hotline Referral form identifies August 1, 2006, as the date of the complaint, as do the letters sent to interested parties announcing the outcome of the agency's investigation.  Moreover, the investigation was completed on September 3, 2006, a full-month before the report cited by Carlisle's counsel.[7]  As such, even if the incident with the brothers occurred, it could not have caused the injuries observed by Dr. Molinari three months later on May 12, 2006.  Therefore, the records could properly be excluded at trial on the grounds that they constitute hearsay or because they are barred by Ohio's Rape Shield statute.

Mechanical application of the hearsay rules is not always *per se* constitutional.  *See*

---

[7]  While the exact source of the allegation is unclear, K.C. reported an identical allegation to a social worker, who interviewed K.C. prior to the incident report – on July 19, 2006. When asked if something happened with her brothers [not KH.C.], K.C. stated that her 12-year-old brother "took the [4-year-old's] clothes off and his diaper.  They put him on me."  She further stated that she "didn't want the baby on me, cause I don't like having sex with him."

*Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (holding that, given the particular facts of that case, exclusion of trustworthy hearsay evidence critical to the defense, coupled with an unrelated error, resulted in a denial of due process).  Nonetheless, hearsay rules are not themselves arbitrary and their routine application does not violate the constitutional right to present a defense.  *See, e.g., United States v. Persico*, 2006 U.S. Dist. LEXIS 81653 (E.D.N.Y. Oct. 23, 2006).  Furthermore, the instant case is not analogous to *Chambers*.

> [Under the facts of the Chambers case] the district court excluded testimony, on hearsay grounds, by three different parties who would have testified that an individual other than the defendant admitted to committing the murder in question.  The Court found that these statements, which were offered at trial, were made in "circumstances that provided considerable assurance of their reliability." n47.  In particular, the Court noted that (1) the confessions were made spontaneously to close acquaintances shortly after the murder; (2) each statement was corroborated by other evidence; (3) the same confession was made three times; (4) the confessions were against interest; and (5) the person who allegedly made the confession was available to testify.

*United States v. John*, 597 F.3d 263, 277 (5th Cir. 2010) (summarizing *Chambers*).  Even if the trial court's ruling was based on Ohio's Rape Shield Law, the analysis does not change.  In *Michigan v. Lucas*, the Supreme Court addressed the State of Michigan's rape-shield statute and explained that "[while] the statute unquestionably implicates the Sixth Amendment ... [t]o the extent that it operates to prevent a criminal defendant from presenting relevant evidence," the defendant's diminished ability to confront adverse witnesses and present a defense "does not necessarily render the statute unconstitutional."  *Lucas*, 500 U.S. 145, 149 (1991) ("The right to present relevant testimony is not without limitation [and] ... 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'") (citations omitted).  The *Lucas* Court continued to explain that so long as restrictions on a criminal defendant's rights to confront adverse witnesses and to present evidence is not arbitrary or disproportionate to the

-20-

purposes they are designed to serve, "'trial judges retain wide latitude' to limit reasonably a criminal defendant's right to cross-examine a witness 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'"  *Id.* at 149-51 (*citing Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).[8]

Carlisle cannot establish that the alleged incidents were close enough in time to potentially be the cause of K.C.'s injuries as recorded by Dr. Molinari.  Therefore, the trial court's disallowing the use of the Children's Services  reports was ***not*** a mechanical application of an evidentiary rule applied to "defeat the ends of justice."  *Chambers*, 410 U.S. at 302.  It was not unreasonable for the trial court to do so, regardless of whether the basis was hearsay, rape shield, or relevance.

### 2.        Records From University Hospitals

Carlisle also references documents from University Hospitals that are dated May 15, 2006 – just three days after the injuries sustained by the victim.[9]  These documents contain notes taken by a social worker that reference possible sexual abuse of the victim involving the same aforementioned three siblings.  (Doc. No. 25.)  However, the statement is clearly that of Carol Carlisle, and not of the victim herself.  *Id.*  The social worker's notes repeatedly indicate "per guardian."  *Id.*  Carol Carlisle stated that the victim's story was changing.  *Id.*  There is no

---

[8]  "Rape-shield laws vindicate a legitimate state interest in 'encourag[ing] victims of sexual misconduct to institute and to participate in legal proceedings against alleged offenders.'"  *Vasquez v. Jones*, 496 F.3d 564, 573 (6th Cir. 2007).

[9]  These documents were filed under seal by Respondent, at the Court's request, on January 4, 2011.  (Doc. No. 25.)

foundation establishing that this alleged abuse by her siblings occurred anywhere near the 36-hour time frame.[10]  Neither Carol Carlisle nor any of the social workers witnessed the abuse that caused K.C.'s relevant injuries.  Though Carol Carlisle may have suspected that K.C. was lying and related her concerns to the social workers, the exclusion of such speculative testimony, for the same reasons as discussed in the section above concerning the records from Children's Services, was neither arbitrary nor disproportionate.

### 3.    Cross-Examination of Witnesses

Carlisle also suggests that his trial counsel was prevented from cross-examining the victim concerning the allegations of abuse by her brothers contained in the Children's Services records. First, there is no foundation for the argument that such alleged abuse happened anywhere near the 36 hour window within which the victim's injuries were suffered.  More importantly, Carlisle cannot demonstrate that the trial court's ruling actually foreclosed his counsel from inquiring about others who might have been responsible for the sexual abuse within that 36 hour time-frame.  Indeed, an allegation that somebody other than Carlisle committed the alleged offense does not constitute "other acts" and would not be barred under Ohio's Rape Shield law.  In the pretrial conference before the first trial discussing this matter, the prosecutor stated that the defense "can cross on this child's other versions of what happened that night, but you cannot discuss anything that happened with someone else to her."  (1st Pretrial Tr. 38.)  The trial court indicated "[t]hat's the rule," and defense counsel agreed that it was "[f]air."  *Id*.

_____

[10]  The social worker's notes indicate that she could not get anyone to specify when the alleged abuse involving the three siblings occurred.  (Doc. No. 25.)  It is not clear whether this is a reference to Carol Carlisle, the victim, or both.  The allegation, however, sounds strikingly similar to the allegation contained in the Children's Services records.

While there is certainly some vagueness in the trial court's ruling, this Court does not believe a fair reading of the ruling would restrict Carlisle from inquiry into other potential perpetrators of the charged conduct. The trial court was clearly concerned with not allowing testimony that was hearsay or that was unrelated to the abuse that occurred on or about May 12, 2006. The Court sees no reason to presume that the trial court ever intended to bar questions that could have identified someone else as the cause of the victim's injuries. Also, as discussed below, the trial court did not bar defense counsel from questioning the victim whether her other brother, Kh.C., was the culprit. Thus, there is no reason to assume that the defense could not elicit similar questions regarding allegations that the victim's other brothers may have been her abusers if they had access during the relevant time frame.

Carlisle's current counsel suggests that trial counsel certainly construed the Court's ruling as foreclosing questioning about other potential perpetrators of the abuse. (Oral Arguments Tr. 11-12.) Trial counsel's subjective belief as to the parameters of the court's evidentiary rulings is immaterial. No claim that trial counsel was ineffective for failing to clarify the parameters of the trial court's ruling, for failing to establish who had access to the victim in the 36-hour window, for failing to ask questions of the victim regarding other potential abusers in the same time-frame, or for any other reason has been raised by Carlisle.[11]

Finally, Carlisle's petition suggests that Kh.C. may have been K.C.'s abuser based on K.C.'s testimony at the first trial. (Doc. No. 8 at 8 citing 1st Trial Tr. 388-89.) Carlisle argues

---

[11] For clarification, the Court is not finding that trial counsel was ineffective. It is also quite possible that counsel was not prevented from asking the aforementioned questions by the trial court, but chose not to do so after conducting a diligent investigation knowing that the responses would not help his client. It would be nothing more than speculation by the Court to assume one possibility over another.

-23-

that he was prevented from exploring this line of questioning at the second trial.  *Id.* at 9-10.  The

Court finds that the trial court did not prohibit defense counsel from cross-examining K.C. on

this issue at the second trial as evidenced by the following exchange:

BY MR. CHESELKA [Defense Counsel]:

Q.  [K.C.], do you remember talking to me about this before?

A.  Yes.

Q.  Do you remember telling me about [Kh.C.] pushing you up on the bed?

A.  Yes.

Q.  Do you remember telling me that you didn't want him to?

A.  Yes.

Q.  Do you remember why you didn't want him to?  Do you remember what you told me?

A.  Because – because – because – because I might fall down.

Q.  Do you remember saying you were scared?

A.  Yes.

Q.  And do you remember telling me that you didn't like him pushing you on the bed?

A.  Yes.

Q.  Why didn't you like it?

        MS. DUCOFF [Prosecutor]:  Objection.

A.  Because I was going to fall.

        THE COURT:                Overruled.

-24-

Q.    What happened after he pushed you up on the bed?

                                        ***

A.    I fell down.

Q.    What happened to [Kh.C.] after he pushed you up on the bed?

A.    He said he was sorry.

Q.    Did he go anywhere?

A.    No.

Q.    Do you remember telling me that after he pushed you on the bed he went
      into the closet?

A.    Yes.

Q.    What did he do after he said he was sorry?

A.    He gave me a hug.

Q.    And then what happened?  What did he do?

A.    And then he took me – he took me on my bed so I could sit down and watch
      TV.

Q.    And then what did he do?

A.    And then he watched TV with me.

              MR. CHESELKA:              Nothing further.

(2nd Trial Tr. 251-53.)

     Carlisle clearly had the opportunity to cross-examine K.C. at trial and did, in fact, explore

the theory that perhaps Kh.C. abused K.C.  The trial court specifically overruled the

prosecution's objection to this line of questioning.  K.C.'s responses, however, did not comport

with Carlisle's defense theory.  Kh.C. also testified at trial and was subject to cross-examination.

-25-

(2nd Trial Tr. 279-300.)

As such, Carlisle's allegations – that his right to a defense, right to confront the witnesses against him, rights to due process, and right to a fair trial were violated – are without merit.

### V.  Conclusion

For the foregoing reasons, it is recommended that Carlisle's Petition be DENIED.

s/ Greg White
U.S. MAGISTRATE JUDGE


Date: February 8, 2011

### OBJECTIONS
**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

-26-